In re the PEOPLE of the
State of Colorado,

In the Interest of A.J.C., Minor Child

G.A.L. and K.L., Petitioners

and concerning

C.M.C. and D.C., Respondents.

No. 04SA18.

Supreme Court of Colorado,
En Banc.

April 12, 2004.

Rehearing Denied May 3, 2004.*

Beltz & West, P.C., W. Thomas Beltz, Daniel A. West, Colorado Springs, Colorado, Attorneys for Petitioners.

Samler & Whitson, P.C., Eric A. Samler, Denver, Colorado, Virginia L. Frank, Evergreen, Colorado, Attorneys for Respondents.

Justice KOURLIS delivered the Opinion of the Court.

## I. INTRODUCTION

This is an original proceeding under C.A.R. 21 in which the Petitioners, G.A.L.

* Justice COATS would grant the Petition.

and V.K.L., seek review of an order of the Jefferson County District Court (the "district court") dismissing their Verified Petition for Allocation of Parental Responsibilities, Writ of Habeas Corpus, and subsequent Order denying the Petitioners post-judgment relief. Specifically, the Petitioners ask this court to reverse those orders and remand the matter back to the district court for an evidentiary hearing on their Verified Petition for Allocation of Parental Responsibilities. We issued a Rule to Show Cause on January 20, 2004, and ordered expedited briefing.

This case involves a failed adoption. The child, A.J.C., was born in Missouri on April 18, 2003. Immediately after his birth, the natural mother consented to the placement of the child for adoption with a Colorado couple, the Petitioners, who returned here with him and have remained here. In October of 2003, the Missouri court dismissed the adoption petition filed by the Petitioners in Missouri because the natural mother had, by that time, withdrawn her consent. The Missouri court eventually ordered that the Petitioners return the child to the mother. The Petitioners commenced a proceeding in Colorado seeking to establish an ongoing relationship with the child, even though that child was no longer available for adoption.

Had the child been born in Colorado, our statutes and case law would direct the courts of this state to entertain the Petitioner's Petition for Allocation of Parental Responsibilities, despite the failed adoption. That custody determination, like all custody determinations, would be guided by the best interests of the child and a court would take evidence to that effect.

What we consider here is whether, because the child was born in Missouri, spent two days of his life there and was the subject of a Missouri adoption proceeding, the outcome should be a different one. To resolve that question, we look not only to Colorado's and Missouri's internal law, but also to the laws that govern interstate disputes of this nature. Although we uncover more questions than answers in our survey of this body of law, we ultimately conclude that there is nothing about the interstate nature of this dispute that would demand that Colorado decline to

treat this child as we would treat a child born within our borders.

We organize our analysis in this opinion by first outlining Colorado's internal law, then summarizing the law in Missouri that would appear to apply. Colorado law would clearly direct the court to engage in a "best interests" analysis concerning the placement of A.J.C. Nothing in Missouri law controverts the undertaking of that inquiry, and indeed, Missouri courts themselves have undertaken similar inquiries in other cases.

We then look to the laws in both Colorado and Missouri that bear upon the resolution of interstate disputes of this nature. Colorado previously determined its jurisdiction in interstate custody disputes by reference to the Uniform Child Custody Jurisdiction Act (UCCJA), section 14–13–101, et seq., 5 C.R.S. (1999), which is no longer in place in Colorado, but which is still in place in Missouri. Mo.Rev.Stat. §§ 452.440 to 452.550 (2003). When it was in place, courts of this state construed the UCCJA to apply to custody issues arising out of failed adoptions, and Missouri's courts seem to concur. Hence, if we look to any continuing applicability of the UCCJA by virtue of its force in Missouri, Colorado would be entitled to exercise jurisdiction over this dispute as the home state of the child because the child has resided here for all of his young life.

However, Colorado has repealed the UCCJA, and enacted the more modern Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA). § 14–13–101, et seq., 5 C.R.S. (2003). We conclude that the UCCJEA does *not* apply to failed adoption proceedings, by specific language of the statute. Hence, the UCCJEA offers us little assistance in this controversy. We do note that the exclusion of adoptions from the UCCJEA was made in reliance upon an expectation that states will adopt the Uniform Adoption Act (UAA). Unif. Adoption Act, 9 U.L.A. 16, 16–132 (1994). Although neither Colorado nor Missouri have enacted the UAA, the drafters of the UCCJEA believed the UAA was an important and appropriate outline of law governing adoptions. Thus, we review its terms and conclude that it, too, would

direct Colorado to proceed with a best interests inquiry concerning this child.

Both Colorado and Missouri *have* adopted the Interstate Compact on the Placement of Children (ICPC or the "Compact"). §§ 24–60–1801 to 24–60–1803, 7B C.R.S. (2003); Mo. Ann. Stat. § 210.620 (2003). Under that Compact, the sending agency in Missouri is empowered to cause the return of the child to that state. By virtue of Missouri law, we construe the sending agency to mean the adoption intermediary here, who has declined to request that the child be returned to Missouri.

Accordingly, reviewing all potentially applicable laws, we find nothing that would mandate that Colorado decline to engage in the inquiry that it would afford to a Colorado-born child: namely—assessing the Petitioners' and the natural mother's claims in the context of the child's own best interests. We conclude that the district court erred in determining that it was without jurisdiction to hear the Petitioners' case.

Our decision today comports with the philosophy expressed in the UAA that a child is not "an object that 'belongs' to a parent or would-be parent and has to be shifted back and forth in the event 'ownership' rights are changed or reinstated." Unif. Adoption Act (1994) § 2–408, cmt., 9 U.L.A. 62 (1999). Rather, A.J.C. is a party to this proceeding and, as such, has the right to have his best interests heard and determined by the court, independent of the legal rights of either his biological mother or the Petitioners. We now make the Rule absolute and remand the case to the district court for further proceedings consistent with this opinion.

## II. FACTS AND PROCEDURAL HISTORY

This case concerns a child, A.J.C., who was born in Missouri on April 18, 2003, to C.M.C. (Mother) and D.C. (Father).[1] On April 19, 2003, Mother signed a Transfer of Temporary Custody and Appointment of Power of Attorney for Care of Child. This agreement transferred the physical and temporary legal custody of A.J.C. from Mother to the Petitioners pending a final adoption. The Petitioners are both residents of Colorado.

On April 21, 2003, Mother signed a Consent to Termination of Parental Rights and Consent to Adoption, which was filed with the Circuit Court of St. Charles County, Missouri (the "circuit court"). That same day, the Petitioners filed both a Petition for Termination of Parental Rights and Transfer of Legal Custody and a Petition for Adoption in the circuit court. Additionally, the Petitioners filed a Motion for an Emergency Order for Transfer of Custody. On April 21, 2003, the circuit court entered an Order approving preliminary placement of A.J.C. with the prospective adoptive parents, the Petitioners. The circuit court noted in that Order that it was approving preliminary placement only and that it retained jurisdiction to conduct a formal hearing regarding the termination of Mother's parental rights, the transfer of legal custody of A.J.C. to the Petitioners, and ultimate approval of the Petition for Adoption. At that point, two days after the baby's birth, the Petitioners obtained physical custody of A.J.C. and returned with him to Colorado.[2]

On May 15, 2003, the circuit court entered an Order stating that it could not approve the Consent to Termination of Parental Rights and Consent to Adoption because "[s]aid consent did not identify the name of any possible father of the child," as required by Missouri law. After this Order was entered, Mother apparently changed her mind about the adoption and on July 25, 2003, Mother filed a Motion to Withdraw and Revoke Consent to Adoption with the circuit court. On August 22, 2003, the circuit court entered a Judgment and Order granting

1. The facts cited herein are taken from the briefs and supporting documents submitted by the parties. The records from earlier proceedings in the Missouri circuit court are not before us.

2. We note that we have no record of a guardian ad litem advocating on behalf of A.J.C.'s interests in the adoption proceedings, although Missouri law requires the appointment of such a person. Pursuant to Mo.Rev.Stat. § 453.025 (2003), a court "shall, in all cases where the person sought to be adopted is under eighteen years of age, appoint a guardian ad litem ... to represent the person sought to be adopted."

Mother's motion withdrawing her consent to the termination of her parental rights and consent to the adoption.

On September 26, 2003, Mother filed a Motion to Dismiss the Petitioners' Petition for Adoption. Mother asserted that she had effectively withdrawn her consent to the adoption, thereby terminating the adoption proceedings. As a result, Mother argued that custody of A.J.C. should revert to her.

On October 15, 2003, some six months after Petitioners had obtained custody of A.J.C., the circuit court entered a Judgment of Dismissal of the Petitioners' Petition of Adoption. The circuit court noted that Mother had withdrawn her consent to the termination of her parental rights and consent to the adoption before such consent was reviewed and approved by the court.[3] Furthermore, the circuit court found that no circumstances existed that would allow the adoption to proceed without consent.[4] Thus, the circuit court granted Mother's Motion to Dismiss and ordered that physical custody of A.J.C. be restored to Mother forthwith.

On November 3, 2003, the Petitioners filed a Motion to Vacate the circuit court's Judgment of Dismissal of Petition of Adoption entered on October 15, 2003. On December 5, 2003, the circuit court held a hearing on the Petitioners' Motion to Vacate.[5] On January 2, 2004, the circuit court denied the Petitioners' Motion to Vacate. The circuit court determined that, as a matter of law, Mother effectively withdrew her consent to the termination of her parental rights and to the adoption of A.J.C. by the Petitioners. Furthermore, the circuit court concluded that Mother had not abandoned A.J.C.[6] The circuit court held that "[t]he consequence of that determination is that the child shall be returned to Mother's Custody." However, the circuit court specifically noted that it was not determining custody as between Mother and Father, noting that such a determination "must necessarily await another proceeding."[7]

On October 31, 2003, two weeks after the circuit court ordered that physical custody of A.J.C. be returned to Mother, and four days before the Petitioners filed their Motion to Vacate the Circuit Court Order awarding custody to Mother, Petitioners filed a Verified Petition for Allocation of Parental Responsibilities with the district court in Colorado. On November 3, 2003, Mother filed a Petition for Writ of Habeas Corpus with the district court in Colorado. One month later, on December 3, 2003, Mother filed an Answer to the Petitioners' Petition as well as a Motion to Dismiss the Petition.

On January 3, 2004, the district court entered a Writ of Habeas Corpus commanding

---

3. Mo.Rev.Stat. § 453.030.7 (2003) provides that written consent to adoption "may be withdrawn anytime until it has been reviewed and accepted by a judge."

4. Mo.Rev.Stat. § 453.040 (2003) enumerates certain circumstances where the consent of biological parents to the adoption of a child is not required.

5. A transcript of that proceeding is not before this court.

6. The Petitioners alleged that Mother had abandoned A.J.C. A finding of abandonment would have obviated the need for valid consent to the adoption by Mother and Father pursuant to Mo. Rev.Stat. § 453.040.7.

7. At the present time, there is an appeal pending in the Missouri Court of Appeals. This appeal involves the dismissal of the Petitioner's Petition for Adoption. Specifically, the appeal addresses whether Mother's withdrawal of her consent to

the adoption was valid. However, this appeal does not change the focus of our analysis. To the contrary, this appeal supports the notion that the failed adoption proceedings, to which we are according full faith and credit, are separate and distinct from the issue we address today, namely whether Colorado has jurisdiction to determine who should have custody of A.J.C. Stated differently, this is not a case where the Petitioners seek to re-litigate in Colorado the unfavorable result reached in the Missouri adoption proceedings. Rather, the Petitioners seek an independent custody determination that reflects the best interests of A.J.C. For a discussion of the differences between adoption proceedings and custody proceedings, see Herma H. Kay, *Adoption in the Conflict of Laws: The UAA, Not the UCCJA, is the Answer*, 84 Cal.L.Rev. 703, 728 (1996) (Unlike a custody determination that "commits the court to a supervision of the parent-child relationship" until the child "attains majority or becomes emancipated," adoption proceedings "sever the parental ties created by birth" and "replace them with legal ties that will serve as the foundation for a new parent-child relationship.").

the Petitioners to return the custody of A.J.C. to Mother. That same day, the district court entered an Order dismissing the Petitioners' Verified Petition for Allocation of Parental Responsibilities. The district court found that an initial custody determination regarding A.J.C. had been made by the circuit court in Missouri. As a result, the district court determined that it lacked jurisdiction to entertain the Petitioners' Petition.[8]

On January 8, 2004, the Petitioners filed a Motion for Post Trial Relief in the district court. The district court denied that motion in an Order dated January 13, 2004.[9] The Petitioners filed a Petition for Rule to Show Cause pursuant to C.A.R. 21 with this court on January 20, 2004.[10] We issued a Rule to Show Cause and now make that Rule absolute.

## III. OVERVIEW OF ANALYSIS

The issue before us in this original proceeding is whether the district court had jurisdiction to consider the Petitioners' Verified Petition for Allocation of Parental Responsibilities. Despite the procedural complexity of the case, the ultimate issue is quite simple and quite compelling. Specifically, we must determine whether a court in Colorado has jurisdiction to consider placement of a child when that child has lived in Colorado with prospective adoptive parents in excess of six months and has been determined by another state to be no longer available for adoption.

It is undisputed that the circuit court's order dismissing the Petition for Adoption is entitled to full faith and credit. Indeed, the Petitioners do not seek to re-litigate those adoption proceedings in Colorado. However, the Petitioners do maintain that they have the right to seek custody of A.J.C. notwithstanding the failed adoption in Missouri. Hence, we must determine whether the circuit court's order restoring custody of A.J.C. to Mother as a result of the failed adoption divests Colorado of jurisdiction to determine who should have custody of A.J.C. based on his best interests. To answer this question, we review the internal law in Colorado and Missouri and the applicable laws in both states addressing jurisdiction in interstate disputes of this nature.

## IV. INTERNAL LAW

### A. Colorado Law

Initially, we note that had the failed adoption proceedings taken place exclusively in Colorado, there would be no question that the district court would have jurisdiction to entertain the Petitioners' Verified Petition for Allocation of Parental Responsibilities.

In 1995, this court held that non-parents with physical custody of a child in contemplation of future relinquishment and adoption proceedings had standing under the Uniform Dissolution of Marriage Act (UDMA), section 14–10–101, et seq., 5 C.R.S. (2003), to seek custody of the child after the adoption failed. *In re Custody of C.C.R.S.*, 892 P.2d 246, 253 (Colo.1995) (non-parents who had physical possession and control of a child for six months before the filing of their custody petition had standing under either subsection (1)(b) or (1)(c) of section 14–10–123, 5 C.R.S.

8. It should be noted that the district court did not decide, as a matter of judicial discretion, to decline jurisdiction over the Petitioners' Petition. Rather, the district court determined that, as a matter of law, it lacked jurisdiction. During a January 16, 2004, hearing, District Court Judge Stephen Munsinger stated:

"I'd like nothing better than to have the child remain here in Colorado, and have jurisdiction over the child, but my understanding of the procedure is that Missouri has primary jurisdiction.... If I had jurisdiction I'd be the first one to exercise it...."

9. In his Order, Judge Stephen Munsinger referenced a December 4, 2003, telephone conference between himself and Judge Briscoe, the Missouri circuit court Judge. The court has a transcript of that conference as part of the record in this proceeding. In essence, the conversation between Judges Munsinger and Briscoe consisted of a discussion about the proceedings in Missouri and a conclusion by Judge Munsinger that Judge Briscoe's Order dismissing the Petitioners' Petition for Adoption divested the district court in Colorado of any jurisdiction over the custody of A.J.C.

10. The issue presented for review is "whether or not the Jefferson County District Court erred in dismissing Petitioners' Verified Petition for Allocation of Parental Responsibilities and granting the Writ of Habeas Corpus."

(2003) of the UDMA.) Most importantly, for purposes of the case before us today, we also held that the revocation of a biological parent's consent to the termination of parental responsibilities and adoption did not give the biological parent an automatic statutory right to the return of her child. *C.C.R.S.*, 892 P.2d at 254. Rather, we determined that "the prospective adoption proceedings turned into a custodial dispute under the UDMA, which did not involve the termination of parental rights." *Id.*

Additionally, Colorado's statutes governing adoptions provide that when the relinquishment of a parent-child legal relationship is revoked, "the court shall dismiss any proceeding for adoption and shall provide for the care and custody of the child *according to the child's best interests.*" [11] § 19–5–104(8), 6 C.R.S. (2003) (emphasis added).

■ Hence, in Colorado, by operation of statute and case law, when prospective adoptive parents have custody of a child and the adoption fails, those individuals nonetheless have a right to ask a court to determine whether they may be afforded some ongoing rights and responsibilities in service of the best interests of the child. Those proceedings would, under present law, be governed by the UDMA and, accordingly, the "best interests of the child standard" would apply at that point. *C.C.R.S.*, 892 P.2d at 257–58.

This failed adoption proceeding occurred in Missouri, not Colorado. Therefore, it falls to us to determine whether the interstate nature of this case causes us to change the result reached in *C.C.R.S.*

### B. Missouri Law

Missouri, like Colorado, has recognized that in certain situations, a failed adoption does not automatically result in the custody of a child being restored to the natural parent(s). *See In re Baby Girl,* 850 S.W.2d 64 (Mo.1993) (where trial court considered the validity of a biological mother's consent to adoption, but failed to inquire into the best interests of the child, as required by statute,

the case was remanded for further proceedings). Although *Baby Girl* was based on a specific statute requiring a court to inquire into the best interests of the child when a child is unlawfully removed from the state, we take from that case the principle that failed adoption proceedings do not in all cases require custody to be returned to the biological parent(s).

Indeed, Missouri, like Colorado, emphasizes that the overarching goal in all adoption and custody proceedings is the best interests of the child. *See* Mo.Rev.Stat. § 453.005 (2003) (The statutory provisions governing adoption and foster care "shall be construed so as to promote the best interests and welfare of the child in recognition of the entitlement of the child to a permanent and stable home."); Mo.Rev.Stat. § 452.375.2 (2003) ("The court shall determine custody in accordance with the best interests of the child."); *Shepler v. Sayres,* 372 S.W.2d 87, 90–91 (Mo. 1963) (When adjudicating child custody questions, "it may be said that the prime consideration of the courts, and the ultimately determinative factor in all such cases, is that of the welfare and best interests of the children involved."); *In re K.K.M.,* 647 S.W.2d 886, 892 (Mo.Ct.App.1983) ("The polestar guiding the resolution of custody disputes is the best interests of the child."); *see also In re Neusche,* 398 S.W.2d 453, 457 (Mo.Ct.App. 1966) (holding that "the welfare of the child is the primary and paramount consideration in an adoption or custody proceeding, the wishes of the nature [sic] mother and of the petitioners being secondary and subservient thereto".)

Missouri law also requires the court to appoint a guardian ad litem to represent a minor child such as A.J.C. who is the subject of an adoption proceeding, presumably in order to convey to the court what the best interests of the child are. Mo.Rev.Stat. § 453.025 (2003) (A court "shall, in all cases where the person sought to be adopted is under eighteen years of age, appoint a guardian ad litem ... to represent the person sought to be adopted."). Thus, we con-

---

11. Although the revocation of a relinquishment of parental rights is not the precise factual circumstance we face to today, this statutory provision is certainly instructive and persuasive as to the legislature's intent.

clude that Missouri's law, like Colorado's, supports the proposition that custody determinations, even after a failed adoption, must take into account the best interests of the child.

## V. Applicable Interstate Laws

Because interstate child custody decrees are a fact of modern life, various state and national laws have been passed that address enforcement of those decrees. State legislatures around the country have adopted, with some variation, the Uniform Child Custody Jurisdiction Act (UCCJA), *see e.g.,* Mo.Rev. Stat. §§ 452.440 through 452.550, and its successor, the Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA), which appears in the Colorado statutes at section 14–13–101, et seq., 5 C.R.S. (2003).

Prior to 2000, Colorado relied upon the UCCJA to determine whether a court of this state had jurisdiction to enter an initial custody order or to modify a pre-existing custody order entered by another state. However, during the 2000 legislative session, our General Assembly repealed the UCCJA and enacted the UCCJEA, which significantly altered the jurisdictional requirements in interstate custody disputes. Ch. 320, secs. 1–2, § 14–13–101, et seq., 2000 Colo. Sess. Laws 1519, 1519–37. Missouri continues to operate under the old framework of the UCCJA, and has not adopted the UCCJEA. *See* Mo.Rev. Stat. §§ 452.440–550 (2003).

The United States Congress has recognized the national importance of interstate child placement issues by adoption of the Parental Kidnapping Prevention Act of 1980 (PKPA), § 8, 28 U.S.C.A., § 1738A (2003), which requires the courts of every state to enforce a child custody determination of a sister state made consistently with the provisions of that Act.

Lastly, all fifty states, including Missouri and Colorado, have adopted the Interstate Compact on the Placement of Children (ICPC). *See* 2 Am.Jur.2d *Adoption* § 28 (2003). The ICPC appears in the Colorado statutes at sections 24–60–1801 through 24–60–1803, 7B C.R.S. (2003).

### A. The UCCJA and UCCJEA

Missouri relies upon the UCCJA; Colorado upon the UCCJEA. The UCCJA, when it was in place in Colorado, was held to apply to failed adoptions. Missouri case law appears to accord with that conclusion. The UCCJEA, on the other hand, does not apply to adoption proceedings. In light of the significant differences between the UCCJA and the UCCJEA, we examine each in turn.

#### i. Jurisdiction Under the UCCJA

The UCCJA is jurisdictional legislation that was developed by the National Conference of Commissioners on Uniform State Laws (NCCUSL) in 1968, and was adopted in Colorado in 1973, nearly verbatim. *L.G v. People,* 890 P.2d 647, 655 (Colo.1995).

The UCCJA applies to "custody determinations" made in "custody proceedings." *See* § 14–13–103(2) and (3), 6B C.R.S. (1999); *L.G.,* 890 P.2d at 657. Although the term "adoption" does not appear in the UCCJA's definition of child-custody determinations or child-custody proceedings, courts of this state construed the UCCJA to include adoption proceedings. *See In re Custody of K.R.,* 897 P.2d 896, 899–900 (Colo.App.1995) (Adoption proceedings are "custody proceedings" within the meaning of the UCCJA, and therefore its jurisdictional prerequisites apply to custody determinations following a failed adoption.).[12]

Missouri appears to be among the states that would similarly apply the UCCJA to adoption proceedings. *See In re T.C.M.,* 651

---

**12.** Although courts in other jurisdictions have similarly concluded that the UCCJA applies to adoption proceedings, this conclusion is by no means unanimous. *See In re Adoption of Asente,* 90 Ohio St.3d 91, 734 N.E.2d 1224, 1231 (2000) (recognizing that there is disagreement as to whether the UCCJA should apply to adoption proceedings); *see also Johnson v. Capps,* 415 N.E.2d 108, 110 (Ind.Ct.App.1981) (Adoption proceedings are brought for the purpose of terminating all parental rights of the biological mother, not to establish or modify a custody decree, and therefore adoption proceedings are not governed by the UCCJA.); *see also* Herma H. Kay, *Adoption in the Conflict of Laws: The UAA, Not the UCCJA, is the Answer,* 84 Cal.L.Rev. 703 (1996) (arguing against the applicability of the UCCJA to adoption proceedings).

S.W.2d 525, 528 (Mo.Ct.App.1983) (Assuming the UCCJA applied to adoptions, Missouri, as the home state of the child, could take jurisdiction over a proceeding in which the prospective adoptive parents resided in Missouri, although the contested adoption proceeding had occurred in North Carolina.).[13]

Under the UCCJA, courts of this state employed a two-part test to determine whether jurisdiction in a custody matter is proper. *L.G.*, 890 P.2d at 656 (citing *Barden v. Blau*, 712 P.2d 481, 484 (Colo.1986)). First, a court was required to determine whether, as a threshold matter, it could properly exercise jurisdiction over a case pursuant to section 14–13–104 of the UCCJA. *L.G.*, 890 P.2d at 656. If the statute conferred jurisdiction, the court was nevertheless required to determine whether, under other provisions of the UCCJA, the court ought to exercise that jurisdiction. *Id.*

Section 14–13–104(1)(a) (c), 5 C.R.S. (2003) of the UCCJA provided three general bases for an assertion of jurisdiction over custody proceedings: (1) if the state was the child's home state,[14] and one parent or person acting as a parent continued to live in the state even though the child did not; (2) if the child had significant connections with the state so that it was in the child's best interests for that state to assume jurisdiction; and (3) if there was an emergent situation requiring the protection of the child and the child was physically present in the state. *L.G.*, 890 P.2d at 658. Section 14–13–104(1)(d) provided one final avenue for a court to assume jurisdiction. Under that provision, Colorado could assume jurisdiction over the custody proceedings if it appeared that no other state would have jurisdiction under any of the other provisions contained in section 14–13–104. *Id.*

Although the UCCJA identified several different bases for jurisdiction, it provided no clear means of assigning priority among them. Rather, it allowed courts to exercise jurisdiction if any of the jurisdictional requirements within the UCCJA were met. This resulted in the possibility, and indeed the likelihood, that more than one state could assert jurisdiction. *See* Kathleen A. Hogan, *Custody Jurisdiction*, 26 WTR Fam. Advoc. 22, 23 (2004). For precisely this reason, after a court determined it had jurisdiction, it was required to take the additional step of determining whether it ought to exercise that jurisdiction in light of other provisions of the UCCJA.

Most importantly, if a court in this state wanted to modify another state's initial custody decree, it was required to satisfy section 14–13–115, 5 C.R.S. (1999), of the UCCJA. That provision provided that

> [i]f a court of another state has made a custody decree, a court of this state shall not modify that decree unless it appears to the court of this state that the court which rendered the decree does not now have jurisdiction ... or has declined to assume jurisdiction to modify the decree and the court of this state has jurisdiction.

Thus, once an initial custody decree was entered in another state, the courts of this state could only exercise jurisdiction if the other court lacked jurisdiction when the decree was entered or somehow declined to exercise jurisdiction.

In this case, were we to apply the UCCJA, Colorado would clearly have jurisdiction to entertain the Petitioners' Verified Petition for Allocation of Parental Responsibilities. At the point at which the Petition was filed, A.J.C. had lived in Colorado for at least six consecutive months. Therefore, Colorado is

---

**13.** In *In re Baby Girl*, the Missouri court of appeals held that the UCCJA did *not* apply to an adoption proceeding. 1992 WL 139363 *6 (Mo. Ct.App.1992) (not published by virtue of transfer to the Missouri Supreme Court). The Supreme Court reversed on other grounds. *See In re Baby Girl* 850 S.W.2d 64 (Mo.1993).

**14.** Section 14–13–103(5), 5 C.R.S. (1999), defined "home state" as "the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person

acting as parent, for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with any of the persons mentioned." *See also* § 14–13–104(1)(a), 5 C.R.S. (1999) ("A court of this state ... has jurisdiction to make a child custody determination by initial or modification decree if ... [t]his state is the home state of the child at the time of commencement of the proceeding.")

the home state of A.J.C. under the UCCJA. Additionally, the Petitioners fall within the statutory definition of persons "acting as a parent" because they have had physical custody of A.J.C. since his birth and have exercised all parental rights and responsibilities. However, our conclusion that Colorado is the home state of A.J.C., by itself, would be insufficient to confer jurisdiction upon Colorado under the UCCJA. Rather, we would also be required to consider whether Colorado, in light of other provisions of the UCCJA, should exercise jurisdiction in this case.

Viewing Missouri's order as akin to an initial custody decree, we would be bound under the UCCJA to examine the provisions of section 14–13–115 to determine whether we had jurisdiction to modify that decree. The relevant inquiry for purposes of this case would be whether Missouri had declined to exercise its jurisdiction by virtue of having failed to determine custody of A.J.C. according to his best interests.

Other jurisdictions relying upon the UCCJA have examined that precise dilemma. Some courts have recognized the need to accord full faith and credit to custody decrees of other states. Others have concluded that the failure to make custody determinations according to the best interests of the child may be construed as a declination of jurisdiction, thereby enabling the state where the child resides to exercise jurisdiction.

The two lead cases around the country on opposing sides of this issue are a New Jersey Supreme Court case and a Michigan Supreme Court case. In *E.E.B. v. D.A.*, 89 N.J. 595, 446 A.2d 871 (1982), *cert. denied*, 459 U.S. 1210, 103 S.Ct. 1203, 75 L.Ed.2d 445 (1983), the New Jersey Supreme Court held that New Jersey was not obligated under either the Parental Kidnapping Prevention Act of 1980 (PKPA), § 28 U.S.C. 1738A (2004), or the UCCJA to enforce a custody determination made by another state following a failed adoption where the other state did not consider the best interests of the child.

In *E.E.B.*, both the adoptive parents and the natural mother resided in Ohio at the time mother surrendered the child to the state and adoption had been effectuated by the Ohio courts. 446 A.2d at 873. Shortly after the adoption, the mother revoked her consent. *Id.* To regain custody of the child, she initiated a habeas corpus action in the Ohio courts, ultimately appealing to the Ohio Supreme Court. *Id.* at 874. The Ohio Supreme Court concluded that the natural mother had effectively revoked her consent and it determined that the right to custody belonged with the natural mother and, without conducting a best interests hearing, ordered the return of the child to her. *Id.* at 873–74. During the appeals process, however, the adoptive parents had moved with the child to New Jersey. *Id.* at 874. The parents then instituted an action for custody in the courts of New Jersey. *Id.* at 874.

In approving a New Jersey court's exercise of jurisdiction over the case despite the prior custody determination made in Ohio, the New Jersey Supreme Court held that:

> Ohio's failure to conduct a best interest hearing constitutes a refusal to exercise jurisdiction under 28 U.S.C.A. § 1738A(f)(2). Under PKPA, therefore, New Jersey is free to modify the Ohio decree. This result comports with the congressional intent that child custody decisions be made in the state best able to determine the best interest of the child. See Pub.L.No. 96–611, section 7, 94 State. 3568.

*Id.* at 877. Ultimately, the court held that by declining to determine the best interests of the child, Ohio enabled the New Jersey courts to modify the initial custody determination from Ohio without violating the full faith and credit clause or federal and state statutes, including the UCCJA. *Id.* at 880.

The Supreme Court of Appeals of West Virginia reached a similar result in *Lemley v. Barr*, 176 W.Va. 378, 343 S.E.2d 101 (1986). In that case, adoption proceedings that were initiated in Ohio were invalidated. The natural mother then brought a habeas corpus action in West Virginia to secure custody of the child from the prospective adoptive parents living with the child in West Virginia. The West Virginia court held that the judgment from Ohio setting aside the adoption was entitled to full faith and credit. *Id.* at

105. Nevertheless, the court held that West Virginia retained jurisdiction to determine custody in light of the child's best interests. *Id.; see also In re Baby Girl L.*, 51 P.3d 544 (Okla.2002) (rejecting due process claim of out-of-state prospective adoptive parents seeking custody of child but ultimately holding that Oklahoma statutes required court to determine best interests of child after a failed adoption).

The Supreme Court of Michigan held otherwise when confronted with this issue. *In re Baby Girl Clausen*, 442 Mich. 648, 502 N.W.2d 649 (1993); *but see id.* at 668 (Levin, J., dissenting).[15] In that case, the court rejected the argument that the judgment of an Iowa court should not be enforced based on the fact that it did not conduct a hearing concerning the best interests of the child in making a custody determination after a failed adoption. *Id.* at 660. The court determined that the UCCJA does not require, as a substantive test, that each jurisdiction apply a best interests of the child standard when making custody determinations. *Id.* at 661. Rather, the court concluded that "[e]ach state, through legislation and interpretive decisions of its courts, is free to fashion its own substantive law of family relationships within constitutional limitations." *Id.*

■ As we stated earlier, the UCCJA embodies the notion that custody decrees entered in one state are entitled to full faith and credit in Colorado. However, because the circuit court failed to determine the best interests of A.J.C., we conclude that Colorado would not be obligated under the UCCJA to give full faith and credit to the circuit court's order granting custody to Mother. In *Department of Social Services v. District Court*, 742 P.2d 339 (Colo.1987), this court concluded that two children who had been found dependent and neglected in Ohio and who were in Colorado in a social services placement had to be returned to Ohio upon the request of the Ohio Department of Social Services, the sending agency. The majority focused on the authority of the sending agen-

cy to require return of the children, and did not address a best interests analysis. However, Justices Mullarkey and Rovira specially concurred; citing to *E.E.B.*, they would have permitted Colorado to retain jurisdiction under the UCCJA for purposes of conducting a "best interests" hearing. 742 P.2d at 342–43.

Thus, under the UCCJA—the prevailing law in Missouri—we conclude that Colorado could properly exercise jurisdiction over the Petitioners' Verified Petition for Allocation of Parental Responsibilities.

### ii. Jurisdiction Under the UCCJEA

We come now to the modern version of the UCCJA—the UCCJEA. In 1997, the NCCUSL unanimously endorsed the UCCJEA. Patricia M. Hoff, *The ABC's of the UCCJEA: Interstate Child–Custody Practice Under the New Act*, 32 Fam.L.Q. 267, 267 (1998). As we mentioned above, our legislature adopted the UCCJEA in 2000, thereby replacing the UCCJA. The UCCJEA was formulated to clarify ambiguities and reconcile conflicting interpretations regarding circumstances under which a state has jurisdiction to make or modify custody orders. Hogan, 26–WTR Fam. Advoc. at 24–25. Colorado's UCCJEA provides clearer standards to guide states in exercising or not exercising original jurisdiction over child custody determinations. It also, for the first time, enunciates the standard for continuing jurisdiction and clarifies modification jurisdiction.

The prefatory note adopted by our legislature and accompanying the UCCJEA provides a useful tool for fleshing out the differences between it and its predecessor, the UCCJA. The prefatory note to the legislation implementing the UCCJEA in Colorado indicates that the drafters of the UCCJEA sought to revise the law on child custody jurisdiction in light of federal enactments and almost thirty years of inconsistent case law. Uniform Child Custody Jurisdiction Prefato-

---

15. In *DeBoer v. DeBoer*, 509 U.S. 938, 114 S.Ct. 11, 125 L.Ed.2d 763 (1993), the United States Supreme Court denied an application to stay the decision of the Supreme Court of Michigan in *In re Clausen*. Justices Blackmun and O'Connor dissented, recognizing the fundamental disagreement among various courts dealing with the issue of interstate custody disputes following failed adoptions. 509 U.S. at 938, 114 S.Ct. 11.

ry Note, Art. 14, 5 C.R.S. (2003) ("Prefatory Note").

The drafters of the UCCJEA summarized the revisions made to the UCCJA in the Prefatory Note. We likewise summarize those revisions as follows: (1) unlike the UCCJA, the UCCJEA prioritizes "home state" jurisdiction; (2) the UCCJEA clarifies the parameters for exercising emergency jurisdiction; (3) unlike the UCCJA which failed to clearly enunciate that the decree granting State retained exclusive continuing jurisdiction to modify a decree, the UCCJEA provides for exclusive continuing jurisdiction for the state entering the initial custody decree; (4) the UCCJEA provides greater specificity as to what custody proceedings are covered within its ambit; (5) the UCCJEA eliminates the term "best interests" in order to clearly distinguish between the jurisdictional standards and the substantive standards relating to custody and visitation of children; and (6) the UCCJEA provides for other miscellaneous changes to the UCCJA.

 The most important and ultimately dispositive provision of the UCCJEA for our purposes is the one that provides that the UCCJEA "does not govern an adoption proceeding." § 14–13–103, 5 C.R.S. (2003). The Prefatory Note acknowledges that the definition of custody proceedings under the UCCJA was ambiguous. Prefatory Note at § 4. To clarify this ambiguity and to harmonize conflicting decisions around the country, the UCCJEA "includes a sweeping definition that, *with the exception of adoption*, includes virtually all cases that can involve custody of or visitation with a child as a 'custody determination.'" *Id.* (emphasis added).[16]

While the UCCJEA's exclusion of adoptions clarifies the ambiguities created under the UCCJA, this exclusion also creates an obvious gap in the jurisdictional legislation governing interstate adoptions. *See* Hoff, 32 Fam.L.Q. at 276–77 ("Because the [Uniform Adoption Act] has not yet been widely adopted, the exclusion of adoption cases from

the UCCJEA creates a void in state jurisdictional rules applicable in interstate adoption cases. To avoid the confusion this can be expected to cause, states can either add adoption to the list of covered 'custody proceedings' in [the] UCCJEA ..., or enact the jurisdictional provisions of the [Uniform Adoption Act] as part of the UCCJEA."). To fill this void, the drafters of the UCCJEA intended that state legislatures also adopt the Uniform Adoption Act (UAA). Specifically, the drafters stated that:

> Two proceedings are governed by other acts. Adoption cases are excluded from this Act because adoption is a specialized area which is thoroughly covered by the Uniform Adoption Act (UAA) (1994). Most states will either adopt that Act or will adopt the jurisdictional provisions of that Act. Therefore the jurisdictional provisions governing adoption proceeding [sic] are generally found elsewhere.

Unif. Child Custody Jur. & Enf. Act § 103, cmt., 9 U.L.A. 660–61 (1999).

Section 3–704 of the UAA covers the circumstance we address today as follows:

> If a court denies a petition for adoption, it shall dismiss the proceeding and issue an appropriate order for the legal and physical custody of the minor. If the reason for denial is that a consent or relinquishment is revoked or set aside pursuant to Section 2–408 or 2–409, the court shall determine the minor's custody according to the criteria stated in those sections. If the petition for adoption is denied for any other reason, the court shall determine the minor's custody *according to the best interest of the minor.*

Unif. Adoption Act (1994) § 3–704, 9 U.L.A. 95–96 (1999) (emphasis added).

Because this case involves Mother's revocation of her consent to the adoption, the provisions of section 2–408 of the UAA would apply. The comments to that provision state in pertinent part:

---

**16.** The conundrum here is that if we view Missouri as having addressed the custody issue at all, it was only as a part of having recognized that the adoption failed. Hence, the order was a part of an adoption proceeding and the UCCJEA

does not apply. If, on the other hand, we view the adoption and custody proceedings as separate proceedings, then Missouri has entered no custody order and Colorado would have initial original jurisdiction.

This section and Section 2–409 deal with circumstances under which a consent or relinquishment is revoked or may be set aside. Revocation of a consent to a direct placement may occur, without judicial action, under two circumstances. First, a birth parent who executes consent before the minor is 192 hours old can decide to revoke within those 192 hours.... This right to revoke is absolute and requires the prospective adoptive parents or their attorney to return the infant to the parent if the infant had been placed with them.... Second is when the parent and the prospective adopter mutually agree to revoke the consent and not proceed with the proposed adoption.

Any other effort to set aside a consent requires judicial action. Until a decree of adoption is issued, a consent will be set aside if the parent proves by clear and convincing evidence that it was obtained by fraud or duress.... A finding of fraud or duress is tantamount to a finding that a valid consent never existed and therefore the parent has never agreed to the adoption of the child and the would-be adoptive parents have no basis for retaining custody of the child. The adoption proceedings must come to an end.

Actions to set aside consents for other reasons have less certain outcomes. Even if a parent establishes by a preponderance of the evidence that one or more of the contingencies specified in the consent has occurred—for example, the other parent's rights have not been terminated—*it does not automatically follow that the parent is entitled to the legal or physical custody of the minor.* The Act provides that the court has to take into account the minor's circumstances at the time consent is set aside. Even though an adoption proceeding may have to be dismissed, the court has to make an order for the minor's care and custody. *In making this order, this court must consider not only the status of the birth parent but also the needs and interests of the minor. It is therefore possible under some circumstances for the individuals who sought to adopt the minor to end up with custody of the minor.* Much will depend on the relationship between the minor's birth parents, the length of time the minor has been out of their custody, whether independent grounds exist for terminating the rights of either birth parent, *the recommendation of the minor's guardian ad litem* [appointed in any contested proceeding, Section 3–201], the willingness of the would-be adopters to retain custody even if an adoption is not granted.

Most importantly, the Act *does not treat a minor as an object that "belongs" to a parent or would-be parent and has to be shifted back and forth in the event "ownership" rights are changed or reinstated. The fact that a birth parent's status as a legal parent may be restored or recognized upon the setting aside of a consent or relinquishment is not tantamount to a determination that the minor must be placed in that parent's custody.*

Unif. Adoption Act (1994) § 2–408, 9 U.L.A. 61–62 (1999) (emphasis added).

Thus, the UAA contemplates that when an adoption fails after the child has been with the prospective adoptive parents for some period of time, the court must take into account the best interests of the child in making determinations about continuing placement.[17] The UAA's approach to custody determinations following a failed adoption is consistent with Colorado's statutory provisions and case law. *See* § 19–5–104(8), 6 C.R.S. (2003); *C.C.R.S.*, 892 P.2d at 254.

Our General Assembly has adopted the UCCJEA, but not the UAA. The drafters of the UCCJEA intended that the exclusion of adoptions be addressed by enactment of the UAA, which in turn would provide that Colorado should exercise jurisdiction over this dispute in order to determine the best interests of the child.

We observe that it would not direct a different outcome than that which we reach today in balancing the competing interests of Missouri and Colorado.

---

**17.** Section 3–101, the jurisdictional provision of the UAA, mirrors to a large extent the provisions of the UCCJA (not the UCCJEA). Unif. Adoption Act, art. 1, pt. 1, cmt., 9 U.L.A. 66–67 (1999).

In summary then, Missouri still follows the UCCJA, which would allow Colorado to exercise jurisdiction if we were to determine, like New Jersey, that the failure to examine the best interests of A.J.C. amounted to a declination of jurisdiction. Colorado has the UCCJEA, which does not apply to adoptions; however, it excludes these proceedings in reliance upon the expectation that state legislatures will enact the Uniform Adoption Act in its stead. The UAA would direct Colorado to exercise jurisdiction over the Verified Petition for the purpose of reviewing the best interests of A.J.C.

## B. The PKPA and ICPC

Within this web of applicable law, we must also recognize and analyze the PKPA and the ICPC.

We conclude that the Parental Kidnapping Prevention Act of 1980 (PKPA or the "Act"), § 28 U.S.C.A. 1738A (2004), does not change the outcome of this case. That Act "imposes a duty on the States to enforce a child custody determination entered by a court of a sister State if the determination is consistent with the provisions of the Act." *Thompson v. Thompson*, 484 U.S. 174, 175–76, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); § 28 U.S.C.A. 1738A(a). Under the PKPA, and by virtue of full faith and credit, "[o]nce a State exercises jurisdiction consistently with the provisions of the Act, no other State may exercise concurrent jurisdiction over the custody dispute, § 1738A(g), even if it would have been empowered to take jurisdiction in the first instance." *Thompson*, 484 U.S. at 177, 108 S.Ct. 513.

When it enacted the PKPA, Congress meant to address the problem of conflicting state custody determinations resulting from the legal vacuum created by inconsistent versions of the UCCJA adopted by the various states; the Act affirmatively implemented full faith and credit requirements applicable to all custody determinations. *Id.* at 181, 108 S.Ct. 513. Importantly, "[t]he sponsors and supporters of the Act continually indicated that the purpose of the PKPA was to provide nationwide enforcement of custody orders made in accordance with the terms of the UCCJA." *Id.*

The PKPA does not specifically exclude adoptions. Our courts have previously construed the term "custody determination" under the UCCJA, *K.R.*, 897 P.2d at 900, to include adoption proceedings, as other courts have. *See, e.g., E.E.B.*, 446 A.2d at 876. Thus, for purposes of this opinion, we assume that the PKPA applies to this case.

Accordingly, because another state has already entered a custody determination concerning this child, we inquire not whether we may exercise jurisdiction under the PKPA but whether the first-in time court's exercise of jurisdiction was in accordance with the PKPA and whether that jurisdiction continues. *In re Marriage of Zierenberg*, 11 Cal. App.4th 1436, 16 Cal.Rptr.2d 238, 241 (1992). The PKPA provides that "every State shall enforce according to its terms, and shall not modify except as provided in subsections (f), (g), and (h) of this section, any custody determination ... made consistently with the provisions of this section by a court of another state." § 1738A(a). The Act states that a custody determination of another state is made consistently with the PKPA as long as (1) the court of the other state has jurisdiction under the law of that state, § 1738A(c)(1), and (2) at least of one of several listed conditions is met.[18]

As pertinent here, one of those conditions is whether the court in the other state has "continuing jurisdiction" under subsection (d) of the statute. Subsection (d) provides that continuing jurisdiction is to be found wherever the court has jurisdiction under the law of that state and either the child or any person claiming custody to the child remains in that state. § 1738A(d); § 1738A(b)(2). Under this definition, then, the Missouri court has

---

**18.** Broadly stated, those conditions are: (a) the state is the child's home state; (b) no other state would have jurisdiction and it is in the best interests of the child for the state to exercise jurisdiction; (c) the child is physically present in the state and has been abandoned or jurisdiction is necessary because of the threat of mistreatment; (d) no other state would have jurisdiction under (a),(b), or (c); or (e) the court has continuing jurisdiction. § 28 U.S.C.A. 1738A(c)(2) (2004).

continuing jurisdiction related to the custody order in this case.

Accordingly, under the PKPA, we may not modify that order unless one of the Act's exceptions is satisfied. Subsection (f) of the Act provides that "[a] court of a State may modify a determination of the custody of the same child made by a court of another State, if (1) it has jurisdiction to make such custody determination; and (2) the court of the other State no longer has jurisdiction, or it has *declined to exercise such jurisdiction to modify such determination.*" (emphasis added). Because, as we noted above, Missouri has continuing jurisdiction under the Act, the exception would permit us to exercise our jurisdiction only if Missouri has declined such jurisdiction.

As the U.S. Supreme Court importantly noted in *Thompson,* custody orders tend to be in conflict among the states because of "the fact that custody orders characteristically are subject to modification as required by the best interests of the child [and a]s a consequence, some courts doubted whether custody orders were sufficiently 'final' to trigger full faith and credit requirements." *Thompson,* 484 U.S. at 180, 108 S.Ct. 513. Thus, "[b]ecause courts entering custody orders generally retain the power to modify them, courts in other States were no less entitled to change the terms of custody according to their own views of the child's best interest." *Id.* Because the right to modify remains with the state entering the first custody by virtue of the best interests of the child, some courts, such as the New Jersey Supreme court in *E.E.B.,* have held that where a state court enters a custody decree without making a determination of the best interests of the child, it specifically declines its jurisdiction to modify that order. 446 A.2d at 877.

■ Because that interpretation seems to accord with the purpose of the PKPA, as enunciated by the U.S. Supreme Court, we similarly apply the analysis of *E.E.B.* here. Consequently, we determine that because Missouri failed to conduct a best interests analysis in issuing its custody decree, it declined jurisdiction to modify that order under section 1738A(f). Thus, we conclude that our exercise of jurisdiction in this case is consistent with the terms of the PKPA.

We are left, then, with the ICPC. The ICPC is an interstate compact, which is in place in both Colorado and Missouri. §§ 24–60–1801—1803, 7B C.R.S. (2003); Mo. Ann. Stat. § 210.620 (2003). Unlike the UCCJEA, it specifically applies to adoptions. Article V of the ICPC contains the jurisdictional mandate. It states in pertinent part that:

> The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted.... Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law.

§ 24–60–1802, art. V(a), 7B C.R.S. (2003). Article II of the Compact defines a "sending agency" as "a party state, officer or employee thereof; a subdivision of a party state, or officer or employee thereof; a court of a party state; a person, corporation, association, charitable agency, or other entity which sends, brings, or causes to be sent or brought any child to another party state." § 24–60–1802, art. II(b). Mother argues that because the adoption failed, Missouri, as the sending agency, retains jurisdiction over the custody of A.J.C.

■ First, under Missouri law, the sending agency was not the state of Missouri but rather a person, Laura Sipes. *See In re Baby Girl,* 850 S.W.2d 64, 69 n. 6 (Mo.1993). Sipes was an intermediary who was designated to assist with the placement of A.J.C. The State Compact Administrator in Missouri identified her as the sending agency by way of a signed document entitled "Interstate Compact Placement Request." As such, Ms. Sipes retained jurisdiction over the child to determine all matters until the child was adopted, became self-supporting or was discharged with the concurrence of the appropriate authority in the receiving state. Such jurisdiction includes the power to effect or cause the return of the child or his transfer

to another location. *See* § 24–60–1802, art. II(c).

Accordingly, if the sending agency demands that the child be returned to the state where the proceeding began, such determination is entitled to be honored under the ICPC. Both Colorado and Missouri would support such an outcome. *See Dep't of Soc. Servs. v. Dist. Court,* 742 P.2d at 341–42; *see also Baby Girl,* 850 S.W.2d at 69–70.

The problem here, however, is that Sipes has sought no such outcome. Rather, in Sipes' affidavit[19] filed with this court, she specifically states that she does not request the return of A.J.C. Rather, she expresses that it is in the best interests of A.J.C. to remain in Colorado.

This is more than a mere technicality. It highlights a deficiency in the Missouri proceeding which in turn amplifies the dilemma we face here. The sending agency, in the form of Ms. Sipes, was responsible for sending or causing the child to be sent to Colorado. The court order effectuated that transfer, but the court was not itself responsible for the child as was Ms. Sipes. Ms. Sipes has an ongoing responsibility, by operation of the ICPC and she is not requesting that the child be returned to Missouri. Under its own law, Missouri was initially required to appoint a guardian ad litem for A.J.C. because he was under the age of 18 at the time the adoption was filed. Mo.Rev.Stat. § 453.025 (2003). That GAL would have undertaken the responsibility of conveying to the court in Missouri what A.J.C.'s best interests might be. Based upon the record before us, we have no evidence that such message was conveyed, or inquiry undertaken.

We have already noted that Missouri, like Colorado, recognizes that in certain situations, a failed adoption does not automatically result in the custody of a child being restored to the natural parent(s). *See Baby Girl,* 850 S.W.2d at 69–70. Accordingly, we view Missouri as a state, akin to Colorado, that authorizes, if not requires, an inquiry into the best interests of the child even following a failed adoption. Perhaps because of the absence of a GAL, or perhaps because Ms. Sipes has not requested such an inquiry, it has not occurred. No report or testimony has been offered that would result in the Missouri court making a determination about the ongoing best interests of A.J.C. in light of the failed adoption.

For all of those reasons, we do not view the ICPC as commanding that Colorado decline jurisdiction over the best interests inquiry, when internal law in Colorado, internal law in Missouri, the UCCJA, and the UAA would all support if not mandate that we proceed.

## VI. Conclusion

We conclude that Colorado courts may exercise jurisdiction for purposes of determining custody of the child based upon his best interests. We do not believe our exercise of jurisdiction fundamentally contradicts or ignores the respect we have for our sister state of Missouri. Accordingly, we make our Rule to Show Cause absolute, reverse the district court's order dismissing the Petitioners' Petition and remand this matter for further proceedings consistent with this opinion.

Justice COATS dissents.

Justice COATS, dissenting:

Today, the majority directs the courts of Colorado to ignore the command of a sister state to return an unadopted baby, born on its soil and placed for adoption according to its laws; and instead to decide for themselves whether the child would be better off in the custody of Colorado residents than in the custody of the child's natural parents in the state of its birth. Following a dizzying discussion of jurisdictional statutes, ultimately failing to resolve their individual applicability, the majority concludes that jurisdiction to determine the fate of the child in this case hinges on the choice of the Missouri attorney for the prospective adoptive parents, acting

---

19. Mother sought to strike the Sipes' affidavit because it was not filed with the trial court. We deny that motion and accept the facts as alleged in the affidavit before this court, but recognize that the trial court may revisit the question of Sipes' position on remand if there is any contrary evidence.

as an "intermediary" in the adoption process, rather than the courts of her state.

Whatever my reservations about an adoption scheme that permits a natural parent's unilateral withdrawal of consent to adoption months after placement of the child, such laws involve policy choices belonging to another branch of government and, in this case, to another jurisdiction altogether. In any event, I am much more concerned about the jurisdictional free-for-all that will surely result from the majority's approach and the harm done to children who will be forced to suffer under conflicting custody orders and perpetual jurisdictional disputes. Because I cannot endorse the liberties I believe the majority has taken with the jurisdictional choices of both the Colorado General Assembly and the United States Congress, I respectfully dissent.

Almost a decade ago, following a divided intermediate appellate court ruling, *see In re Custody of C.C.R.S.,* 872 P.2d 1337, 1345–55 (Colo.App.1993) (Taubman, J., dissenting), a bare majority of this court held that the custody provisions of Colorado's dissolution of marriage act also apply to adoptions unrelated to divorce, permitting the courts of this state to allocate the custody and care of children to prospective adoptive parents, without the consent of the otherwise fit, natural parents or the relinquishment of their parental rights. *See In re Custody of C.C.R.S.,* 892 P.2d 246 (Colo.1995); *see also id.* at 259 (Lohr, J., joined by Kirshbaum and Scott, JJ., dissenting); *id.* at 262 (Scott, J., joined by Kirshbaum, J., dissenting). Whatever the merits of that decision, the general assembly's failure to countermand it in the intervening nine years has left it unchallenged as the controlling law of this jurisdiction.

In its opinion today, a majority of the court seeks to extend that judicial power to interstate placements. It does so by again postulating a distinction between the right of prospective adoptive parents to adopt a child and a separate and independent right for them to be granted legal custody of the child. Because even the majority concedes that its obligations under the Full Faith and Credit

Clause require its deference to Missouri's order denying the adoption, it purports only to permit the Colorado District Court to award the care and custody of the child to Colorado non-parents, without actually permitting adoption of the child or termination of the parental rights of the Missouri parents. As tenuous as the *C.C.R.S.* rationale may have been in the *intrastate* context, this court at least had the power to construe Colorado's divorce and adoption statutes *in pari materia* and discover a controlling legislative intent to locate custody in a third party, despite retention by the natural parents of their parental rights. As the majority's strenuous attempt to extend it makes clear, this distinction between custody and adoptability is simply untenable as a device for acquiring jurisdiction in the context of *interstate* adoptions.

The applicability of the Full Faith and Credit Clause to the interstate enforcement of child custody orders has long presented vexing problems. *See In re Baby Girl Clausen,* 442 Mich. 648, 502 N.W.2d 649, 661 (1993). In 1968, the National Conference of Commissioners on Uniform State Laws drafted the Uniform Child Custody Jurisdiction Act (UCCJA), which was subsequently adopted in some form by all 50 states and the District of Columbia. *See L.G. v. People,* 890 P.2d 647, 655 (Colo.1995). A dozen years later, in 1980, Congress responded to the disparate interpretations of the uniform act and continuing disputes over the enforceability of other states' custody decisions by adopting the Parental Kidnapping Prevention Act (PKPA).[1] The federal PKPA imposed a duty on all states to enforce the custody determinations of other states that are consistent with the PKPA itself. 28 USC § 1738A(a)(2004). In part, however, because the PKPA incorporated state UCCJA law, including its overlapping jurisdictional provisions and its highly ambiguous definition of "custody proceedings," deference to sister state custody orders remained inconsistent. *Compare In re Clausen* with *E.E.B. v. D.A.,* 89 N.J. 595, 446 A.2d 871 (1982).

---

**1.** Pub.L. No. 96–611, § 2, 94, Pub. Stat. 3566 (1980).

Almost 30 years after promulgating the UCCJA, the National Conference therefore revisited the law of child custody jurisdiction, and in an attempt to "eliminate the inconsistent state interpretations and harmonize the UCCJA with the PKPA," replaced the UCCJA with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). Uniform Child Custody Jurisdiction Prefatory Note, part 1, article 13, title 14, Colorado Revised Statutes (2004). Since its promulgation in 1997, the UCCJEA has been adopted in more than 30 states, including Colorado. *See* Ch. 320, sec. 1, § 14–13–101—403, 2000 Colo. Sess. Laws 1519.

Key among the expressed purposes of the UCCJEA were its clarification of the standards for exercising original jurisdiction over a child custody determination; its enunciation of a standard of continuing jurisdiction; and its clarification of modification jurisdiction. *See* Uniform Child Custody Jurisdiction Prefatory Note. The accompanying notes to the new, rewritten act also made clear that "the 'best interest' language of the jurisdictional sections of the UCCJA was not intended to be an invitation to address the merits of the custody dispute in the jurisdictional determination or otherwise provide that 'best interest' considerations should override jurisdictional determinations or provide an additional jurisdictional basis." Prefatory Note 5. In order "to clearly distinguish between the jurisdictional standards and the substantive standards relating to custody and visitation of children," the UCCJEA therefore completely eliminated the term "best interests" from its provisions. *Id.*

While the majority's "best-interest" jurisdictional analysis was at least colorable under the UCCJA, under the UCCJEA it has therefore been completely foreclosed. Unlike the UCCJA, the UCCJEA makes an express distinction between initial and continuing jurisdiction; gives priority of initial jurisdiction to the "home state;" and provides for exclusive, continuing jurisdiction (until the occurrence of specified events) in any state making a child-custody determination. *Id.* Because the jurisdictional provisions of the UCCJEA were crafted specifically to preclude simultaneous claims of jurisdiction

by more than one state, it is clear under its provisions that a single jurisdiction has priority of jurisdiction. *See* § 14–13–201.

Although the UCCJEA also provides for the state with priority of jurisdiction to decline to exercise it, in effect creating jurisdiction in another state, it does so only under specific, statutorily defined circumstances. Apart from the misconduct of a party, which may require the state with jurisdiction to decline it, *see* § 14–13–208, jurisdiction may be declined only for the reason that the court with jurisdiction determines that it would be an inconvenient forum under the circumstances of the case and that another state would be a more appropriate forum. *See* § 14–13–207. Significantly, under the scheme of the UCCJEA, jurisdiction may be declined only by the state with priority of jurisdiction and, apart from misconduct by a party, it may do so only by consciously and expressly determining that another state is the more appropriate forum. *Id.* As distinguished from *E.E.B.'s* construction of the UCCJA and PKPA, revived here by the majority, the UCCJEA simply does not allow for a determination by a state seeking jurisdiction that another state with priority of jurisdiction has declined to exercise it by omitting to take some action, whether or not that action would have been required by its own law.

The majority, however, largely ignores the UCCJEA, relying on Missouri's failure to adopt it and Colorado's failure to adopt the Uniform Adoption Act (UAA) to suggest that the UCCJEA is either invalid or inapplicable to this situation. The UCCJEA is not an interstate compact, with applicability only to transactions involving co-signing states, but a jurisdictional statute, expressly defining the limits of this state's jurisdiction over child-custody determinations. *See generally* Bernadette W. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption,* 68 Neb. L.Rev. 292, 295 (1999)(distinguishing interstate compacts from uniform laws). The fact that Missouri continues to abide by a statute that has been expressly repealed by the Colorado legislature has no bearing on the jurisdiction of the Colorado courts. *See* § 14–13–301("A court

of this state shall recognize and enforce a child-custody determination of a court of another state if the other court exercised jurisdiction in substantial conformity with this article or the determination was made under factual circumstances meeting the jurisdictional standards of this article."); *Hector G. v. Josefina P.*, 771 N.Y.S.2d 316, 324 (N.Y.2003)("Unlike its predecessor statute, the UCCJEA was made applicable not only to other states but also to all foreign countries, even if the other jurisdictions have not themselves adopted it."); *see also In re Marriage of Zierenberg*, 11 Cal.App.4th 1436, 16 Cal.Rptr.2d 238 (1992).

Similarly, the UCCJEA clearly expresses no intent that states adopting it will also adopt the UAA, nor is it in any way incomplete or lacking in continuity except in conjunction with the UAA. As its comments indicate, the UCCJEA does not govern adoption proceedings because it contemplates that the jurisdictional provisions governing such proceedings will generally be found elsewhere; "[h]owever there are likely to be a number of instances where it will be necessary to apply this Act in an adoption proceeding." *See* § 14–13–103 (Official Comment). Along with all but one jurisdiction in the country, neither Colorado nor Missouri has adopted the UAA. *See* Unif. Adoption Act of 1994 Jurisdictions Wherein Act Has Been Adopted, 9 U.L.A. 11 (2003)(citing the state of Vermont as the only state that has adopted the Act).

Even if the UCCJA governed this dispute, however, for a host of reasons it would not permit the courts of this jurisdiction to determine the custody of the Missouri child in this case. In the first place, the record indicates

that as a matter of fact the child had not resided in Colorado with the prospective adoptive parents for a period of six months, and in fact was not even six months old, when the Missouri circuit court denied the adoption and ordered the return of the child.[2] Without the authorization of Missouri's order of temporary custody, the child was no longer in the custody of persons acting as parents, and that status could therefore not support a claim that this was the child's "home state." *See* § 14–13–103, 5 C.R.S. (1999)(Repealed July 2000, Ch. 320, sec. 1, § 14–13–101—403, 2000 Colo. Sess. Laws 1519)(defining "home state" as the state where the child lived with his parents, parent or person acting as parent, for at least six months). Moreover, I would reject *E.E.B.'s* declination-of-jurisdiction rationale, at least as understood by the majority to characterize any legislative determination of custody, without separately allowing a judicial assessment of the "best-interests" of the child, as declining to exercise jurisdiction over the question of custody altogether.[3] The shortcomings in that construction have been adequately exposed else where, *see In re Clausen*, 442 Mich. at 675, n. 31, 502 N.W.2d 649, and most recently by the National Conference itself in expressly drafting the UCCJEA to more emphatically protect against any similar interpretation.

Although its purpose in doing so in this jurisdictional debate is not entirely clear to me, the majority also asserts that both the UAA and Missouri domestic law support Colorado's holding in *C.C.R.S.* that custody determinations based on a "best-interest" analysis by the courts are required after failed

2. The child was born in Missouri on April 18, 2003 and was brought to Colorado on April 21, after the Missouri court approved temporary placement with the prospective adoptive parents. On May 15, less than one month later, the court declined to approve termination of parental rights, and on July 25, the birth mother moved to withdraw her consent. On October 15, 2003, six days short of the six-month residence period, the court granted the mother's motion and ordered physical custody restored to her. On October 31, 2003, two weeks after the Missouri court had ordered that physical custody of the minor child be returned to his mother, the prospective adoptive parents filed for parental responsibilities in Jefferson County.

3. To the extent that *E.E.B.* suggested that a declination of jurisdiction would nevertheless not have occurred if, upon consultation, the other state expressly denied any intent to decline jurisdiction, *see E.E.B.*, 446 A.2d at 880, its holding would not support the broader proposition for which it is cited by the majority. In this case, the Colorado District Court actually did consult with the Missouri court and decided that the Missouri court did not intend to decline jurisdiction.

adoptions.[4] While the UAA, unlike either Colorado or Missouri law, limits to a handful of days the period within which a natural mother may unilaterally revoke her initial consent to adoption, it most certainly does not permit the courts to reassign custody away from a natural mother who had custody of her child before the placement, as long as the court finds a valid revocation of consent.[5] Similarly, Missouri would clearly not permit guardianship of a child to be granted to a third party, outside of a proceeding contemplating the relinquishment of parental rights.

Even a cursory review of Missouri law is enough to dispel the suggestion that it permits, much less requires, a "best-interest" hearing before returning custody to the mother under these circumstances. The statute and case law relied upon by the majority for its assumption that Missouri requires such "best-interest" custody determination following failed adoptions are expressly limited to the case of an illegal transfer of custody, which necessarily brings into question the continued fitness of the natural parent. *See In re Baby Girl,* 850 S.W.2d 64 (Mo.1993) (construing Mo. Ann. Stat. § 453.110(1) (West 2004): "Illegal placement of children available for adoption").

In fact, the Missouri statute permitting the court to award custody to someone other than the parent if the court denies an adoption petition says nothing about "best-inter-est." *See* Mo. Ann. Stat. § 453.101 ("In the event that the juvenile court does not grant the adoption, the court may order that a guardian be appointed...."). Significantly, Missouri would permit the court to appoint someone other than the parent as guardian after the adoption is denied only under specified circumstances, including where both parents failed to give required security, both parents are shown to be unfit or adjudged incapacitated, the minor is over fourteen years old and has no qualified parent, or both parents are dead. *See* Mo. Stat. Ann. § 475.045.[6]

Far from taking a position akin to Colorado's choice in *C.C.R.S., see* maj. op. at 604, Missouri does not apply its divorce law to adoption cases. Even where that state permits third-parties to obtain custody under its dissolution of marriage law, *see* Mo. Stat. Ann. § 452.375(5)(5) (permitting Missouri courts to award custody to third-parties only in divorce actions), it rejects the application of a best interest analysis to third-party custody petitions and requires a finding on the record that the parent is unfit, *Cotton v. Wise,* 977 S.W.2d 263, 264 (Mo.1998); *see also Jones v. Jones,* 10 S.W.3d 528, 537 (Mo.App.Ct.1999)(rejecting earlier Missouri Court of Appeals cases, including *In re K.K.M.,* 647 S.W.2d 886 (Mo.Ct.App.1983), *see* maj. op. at 604, that applied a best interest analysis beyond parent versus parent custodial disputes).

4. I do not agree with the majority's suggestion that section 19–5–104(8) offers support for the holding of *C.C.R.S., see* maj. op. at 604, and apparently neither did *C.C.R.S.* The "best-interests" custody determination mandated by section 19–5–104(8) is clearly limited to the situation in which parental rights have already been relinquished but clear and convincing evidence proves that such relinquishment was obtained by fraud or duress. *See* § 9–5–104(7) & (8). Much like the "best-interests" custody determination required by Missouri law following an illegal placement by a parent, *see In re Baby Girl,* 850 S.W.2d 64 (Mo.1993), under such special circumstances, the legislature has clearly determined that automatic return of a child to the former parent would be inappropriate.

5. The UAA provides for the child's care and custody after a failed adoption in a manner that carefully balances the natural parent's rights against the child's best interests. To that end, it describes a series of circumstances in which custody of the child reverts immediately to the parent and those instances in which custody must go to someone other than the parent. *See* Unif. Adoption Act § 2–408, 9 ULA at 60–61. The UAA permits the court to issue an order providing for the care and custody of the child according to the child's best interest after consent is revoked or set aside only if the child was not in the mother's physical custody when placed for adoption or when the consent was given. Unif. Adoption Act § 2–408(f), 9 ULA at 61.

6. Nor does the record, such as it is, support the majority's suggestion that the Missouri court was required but failed to appoint a guardian ad litem in this case. *See* maj. op. at 604–605. Motions filed with the court by both parties clearly attest in their Certificates of Mailing that copies were mailed to an individual designated as Guardian Ad Litem.

Finally the majority comes to the Interstate Compact on the Placement of Children. The compact provides protocols for the interstate placement of children for adoption or foster care. Because the "sending agency" retains the same jurisdiction over custody matters that it would have had if the child had remained in the sending agency's state, § 24–60–1802, art. V(a), 7B C.R.S. (2003); and because the compact's broad definition of "sending agency," see § 24–60–1802, art. II(b), includes not only a party state but also its officers, employees, subdivisions, courts, and any person, corporation, association, charitable agency, or other entity that sends, brings, or causes to be sent or brought any child to another party state; the majority attributes to Missouri law the astonishing proposition that a person assisting with the placement as an intermediary is the "sending agency," within the meaning of the compact, and personally has "jurisdiction" over the child, enabling that person, as distinguished from the courts of her state, to decide whether the child should be returned. Because an affidavit from the Missouri attorney of the prospective adoptive parents was attached to the petition filed in this court, indicating that she acted as the intermediary in this case and that she "sought no such outcome," maj. op. at 613, the majority therefore considers itself free to disregard the order of the Missouri circuit court commanding return of the child to that state.

It is a mystery why the majority would feel obliged to defer to a sister state's construction of an interstate compact, which we have ourselves adopted and construed, see, e.g., Dept. of Soc. Services v. Dist. Court, 742 P.2d 339 (Colo.1987), when it is unwilling even to defer to that state's construction of its own law regarding custody in the wake of a failed adoption. In any event, in fairness to Missouri's high court, I must disagree with the majority's reading of Missouri's construction of the compact. In In re Baby Girl, 850 S.W.2d at 68–69, the Missouri court clearly finds that even an individual mother who attempts an illegal transfer of custody is a "sending agency" within the meaning of the compact, thereby making the compact applicable; but it just as clearly concludes from the terms of the compact that the appropriate court of the sending state—specifically, "the Circuit Court of Dunklin County"—therefore retains jurisdiction over the child. The unremarkable proposition that a sending agency could have no more authority over the child, had it "remained in the sending agency's state," than is permitted by the courts of that state, is implicitly accepted, without question, by this and other states applying the compact. See, e.g., Dept. of Soc. Services, 742 P.2d at 341 ("Based upon our interpretation of the Interstate Compact, the Ohio court's continuing jurisdiction, and HCDHS's withdrawal of its consent to the placement of (the children)...."); [7] Broyles v. Ashworth, 782 S.W.2d 31, 33–34 (Tex.App. 96th Dist.Ct.1989) ("We interpret the statute as meaning that whatever authority the sending agency might have with respect to custody and disposition of the child ... is to be determined according to the law of the sending agency's state.").

More fundamentally, however, the ICPC addresses the treatment and disposition of the child "during the period of the placement." See § 14–13–103(Official Comment). It does not purport to deprive the sending state of jurisdiction over the adoption or provide for separate orders of custody following denial of an adoption. Although the UCCJEA does not govern adoptions themselves, its comments indicate that it may be necessary to apply the Act to adoption proceedings in a number of instances, including those in which a separate custody determination is required after an adoption is denied. See Id. To the extent that the majority's jurisdictional analysis is premised upon a distinction between Missouri's adoption order and a subsequent determination of the custody of the child, jurisdiction over that custody determination is governed by the UCCJEA.

The Missouri court did not decline to rule on the custody of the child. The Missouri

---

7. Although a special concurrence in that case by Justice Mullarkey would have made the majority's distinction between adoption and custody, and would have similarly relied on E.E.B. for the proposition that Colorado could determine the custody of the children rather than returning them to Ohio, in 1987 that position did not win the day. See maj. op. at 608.

statutes permit the appointment of a guardian for a child following a failed adoption for long-term care of the child, but they also specify the limited circumstances in which the court may appoint someone other than the parent as guardian. The Missouri circuit court found that neither consent nor any lack of fitness of the mother permitted the adoption to proceed. In the absence of any condition recognized by the Missouri statutes permitting the appointment of a guardian other than the parent, it ordered custody returned to her. Even the majority agrees that Missouri, rather than Colorado, was the proper jurisdiction to make such a custody determination, unless it declined to exercise that jurisdiction. The majority simply refuses to recognize the Missouri court's custody order because it was not based upon the same substantive criteria that would have been applied by the courts of this jurisdiction.

The majority rationale in this case is truly a textbook example of the evil that the UCCJA was rewritten to abolish. Its uncritical reliance on the mantra of "best-interests" to create an additional basis for jurisdiction fosters the very jurisdictional uncertainty and conflict among child-custody orders that the National Conference sought to eliminate—in the service of the child's best interests. Ironically, because most states have separate statutes already governing adoptions, custody disputes arising from interstate adoptions were not even among the problems that the UCCJEA felt a need to specifically address. Hopefully, this inauspicious beginning for the UCCJEA in Colorado does not portend another thirty-years war between states seeking to substitute their own notions of a child's best interests for those of their sister states.

I respectfully dissent.